## UNITED STATES of America

v.

**Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi, and Ronald Betso.**

No. 87 Cr. 265 (CBM).

United States District Court,
S.D. New York.

Nov. 24, 1987.

Rudolph W. Giuliani, U.S. Atty., New York City by Edward J.M. Little, Mary T. Shannon, S. Alexander Planzos, Sp. Asst. U.S. Atty., for the U.S.

Slotnick & Baker, New York City by Mark Baker, for defendant Mario Biaggi.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Maurice N. Nessen, David Seide, for defendant Stanley Simon.

Kevin P. McGovern, Brooklyn, N.Y., for defendant Peter Neglia.

Skadden, Arps, Slate, Meagher & Flom, New York City by Jeffrey Glekel, David H. Hennessy, for defendant John Mariotta.

Kostelanetz, Ritholz, Tigue & Fink, New York City by Peter J. Driscoll, for defendant Bernard Ehrlich.

Dominick F. Amorosa, New York City, for defendant Richard Biaggi.

Buchwald & Kaufman, New York City by Alan R. Kaufman, for defendant Ronald Betso.

## OPINION

MOTLEY, Senior District Judge.

This opinion is a final disposition of defendants' pretrial motions, on which oral argument was had on October 22 and 26, 1987. This opinion discusses only those motions as to which decision was reserved at oral argument. Motions denied at oral argument are catalogued but not discussed. In its discussion, the Court first considers motions and arguments common to several defendants before those made only by single defendants.

### FACTS

The following brief summary of the facts relevant to the pretrial motions discussed and decided herein, assumed to be true for the purposes of this opinion only, is drawn primarily from the affidavit of Assistant United States Attorney Mary T. Shannon and from the second superseding indictment ("Indictment").

Welbilt Electronic Die Corporation (Welbilt) was founded as a privately held corporation in 1965 by defendant John Mariotta. From that time until early 1986, Mariotta served successively as the corporation's president, chief executive officer, and chairman of the board of directors. In 1970, Fred Neuberger purchased fifty percent of the corporation. From that date until early 1987, he served successively in various executive capacities. In or about 1981, Mario Moreno joined ownership and began his service in a series of executive positions. In the summer of 1983, Welbilt changed its name to Wedtech Corporation (Wedtech) and issued a public offering of approximately six million shares of Wed-

tech stock at $16 per share. By this point, Mariotta owned only about forty-five and a half percent of Wedtech. The corporation was at all times located in the South Bronx.

During the times relevant to the present indictment, Wedtech derived more than ninety percent of its gross revenues from contracts with the United States Department of Defense (DOD) to manufacture various sorts of equipment and from other Government contracts. All of the DOD contracts were awarded to Wedtech through a Small Business Administration (SBA) program that allowed qualified minority-owned and -operated companies to receive United States Government contracts without participating in competitive bidding. To be certified pursuant to this program, known as the Section 8(a) program, more than fifty percent of the company must be owned by an economically and socially disadvantaged member of a minority group. Wedtech first applied for and received Section 8(a) certification in 1975 on the basis of the disadvantaged status of John Mariotta, a Hispanic, who claimed to own more than fifty percent of Wedtech's stock. Wedtech was recertified repeatedly either by the SBA Regional Office responsible for contractors in New York or by the SBA National Office in Washington, D.C., based in part on the recommendations of the SBA District Office and Regional Office. Wedtech did not in fact qualify for Section 8(a) certification during the years that it was receiving DOD contracts on the no-bid basis, but it maintained its certification and the support of the SBA as a Section 8(a) contractor by employing numerous criminal devices including bribery, false statements, and fraud to deceive and ultimately to corrupt the SBA officials responsible for eligibility determinations.

One of the SBA officials involved in the certification process was defendant Peter Neglia. From 1981 until 1986, Neglia was employed as the SBA Regional Administrator for Region II, which comprises New York, New Jersey, and Puerto Rico. From 1984 until 1986, Neglia also served as Acting Chief of Staff for the SBA in Washington, D.C. In 1984, Wedtech paid $2,000 to the New York State Republican Committee Empire Club for Joseph and Peter Neglia and $1,000 to the National Republican Party Inner Circle for Neglia. In early 1985, Neglia asked for an option to purchase 20,000 shares of Wedtech stock. The option was issued in mid–1985 to Neglia in the name of defendant Ronald Betso, a personal friend.

From approximately 1978 until late 1986, Wedtech retained the law firm of Biaggi, Ehrlich & Lang (B & E) as its outside counsel. Between 1978 and 1986, B & E received over $900,000 in legal and other fees from Wedtech. Defendant Mario Biaggi was a partner in B & E from 1967 until 1978, and from 1978 until the date of this indictment, Mario Biaggi represented himself to be counsel to B & E. From 1969 until the present, Mario Biaggi was also a member of the United States House of Representatives representing a district that includes parts of Bronx County, New York. Defendant Richard Biaggi, the son of Mario Biaggi, was apparently associated with B & E from 1982 until the time of the indictment.

Defendant Bernard Ehrlich was a partner in B & E from 1967 until the date of this indictment. He performed almost all of the services provided by B & E to Wedtech. From approximately May through December 1986, Ehrlich also served as a member of Wedtech's Board of Directors. From around March 1986 until the time of this indictment, defendant Neglia was also counsel to B & E. In late 1985, Neglia and Ehrlich demanded that Wedtech pay fifty percent of Neglia's prospective salary at B & E.

In early 1983, Mario Biaggi, Richard Biaggi, and Ehrlich demanded five percent of Wedtech's outstanding stock. Mario Biaggi threatened that if Wedtech did not comply with this demand, he would withdraw B & E's representation of Wedtech before the SBA and withdraw the SBA's support of Wedtech. As a result, over $3,000,000 worth of stock was issued to defendants. Mario Biaggi's interest was concealed by having 112,500 shares of Wedtech stock issued in the name of Richard Biaggi and

by failing to report the acquisition in several years of Ethics in Government–Financial Disclosure Statements. Another 112,500 shares were issued for Ehrlich. In 1984, Mario Biaggi demanded and received $50,000 from Wedtech disguised as a legal fee for, among other things, assisting Wedtech by contacting New York City officials. Defendants used the mails in connection with both of these schemes.

In late 1983, Mariotta, Ehrlich, and Richard Biaggi executed a sham "Stock Purchase Agreement" designed to deceive the SBA about the true extent of Mariotta's ownership interest in Wedtech. At about the same time, Mariotta, Neuberger, Moreno, Anthony Guarglia, and Lawrence Shorten—two Wedtech officers who were not named as defendants in the present indictment—also executed a sham "Stock Purchase Agreement" for the same purpose. Mariotta also concealed his real ownership interest by submitting to the SBA false personal financial statements reflecting a two-thirds ownership interest.

Defendant Stanley Simon was Bronx Borough President from January 1981 until March 1987. In the spring of 1981, Simon demanded that Wedtech hire his brother-in-law, Henry Bittman. Bittman was hired and continued as a Wedtech employee until 1986. From 1983 until mid–1984, Simon demanded that Wedtech pay periodic salary increases to Bittman. Bittman's salary rose to about $35,000 in July, 1984 and he ultimately received over $133,000 in wages from the corporation. In mid–1984, at about the time that Wedtech was attempting to acquire property owned by New York City, Simon demanded over $50,000 in campaign contributions from Wedtech. He instead accepted a commitment for $50,000 to be spent as he directed. Wedtech paid the $50,000 in cash, charitable and campaign contributions from early 1985 to early 1986.

Mariotta, Neuberger, and others used a checking account bearing the name of "F.H.J. Associates" to make the various payments by Wedtech mentioned above. "F.H.J." stood for the names "Fred" (Neuberger), "Helen" (Neuberger), and "John"

(Mariotta). Mariotta and others used the account to divert approximately $5.5 million from Wedtech for their own personal use and for the illegal payments to public officials and others. Mariotta personally diverted over $1.15 million from Wedtech using the F.H.J. account.

Information regarding the criminal activity of persons associated with Wedtech began to surface in mid–1985. The DOD Criminal Investigative Service, the Department of Labor–Office of Labor Racketeering, and the United States Attorney for the Southern District of New York's Public Corruption Unit began an investigation of Wedtech, B & E, and Mario Biaggi.

In July 1986, grand jury subpoenas *duces tecum* were served on Wedtech and B & E. Shortly thereafter, Assistant United States Attorney Shannon, who was assigned to the Southern District's investigation, discovered that the Bronx District Attorney's Office was conducting a parallel investigation of Wedtech. The two offices then decided to conduct the investigation jointly. In October 1986, they discovered for the first time that the Manhattan District Attorney's Office was also investigating Wedtech.

For the next several weeks, Shannon spoke with Manhattan Assistant District Attorney John Moscow in an effort to obtain the release of SBA files that had been subpoenaed by the Manhattan Office. Moscow did not reveal the names of any witnesses who had been immunized for the purposes of testifying before a grand jury in his investigation or the substance of their testimony. The various attorneys associated with the federal investigation also declined offers of access to any transcripts, documents, or information from the New York County proceedings. All subsequent communications related exclusively to administrative matters.

Also in mid-October 1986, Shannon contacted Mariotta and his counsel in an effort to obtain his cooperation with the Wedtech investigation. Shannon noted that there was a possibility that Mariotta would receive immunity if he would testify about crimes committed by other Wedtech offi-

cers and public officials. Mariotta's counsel consistently represented to Shannon that Mariotta had committed no crimes and knew of no crimes committed by others.

In early November 1986, Moscow informed Shannon that the Manhattan District Attorney's Office was going to confer "letter immunity" on Mariotta. Shannon explained that she had reason to believe that Mariotta had committed a variety of federal crimes and that the federal Government had no intention of immunizing him. In late November, Mariotta's counsel informed Shannon for the first time that Mariotta had been speaking to the Manhattan District Attorney's Office since mid-October and had already been immunized. Not until September 1987 did Shannon hear that Mariotta had testified before a New York County grand jury, and she has never been informed of the substance of that testimony.

Shannon also first heard in late November 1986 that Richard Biaggi testified with immunity before the New York County grand jury. She was informed of that fact by Richard Biaggi's counsel but she was not told of the substance of the testimony.

In connection with the federal investigations, several of the defendants were asked to testify about their activities. In February 1986, Simon made false statements to a grand jury concerning his solicitation and/or reciept of items of value in his capacity as Bronx Borough President. Neglia made false statements concerning Wedtech to a Special Agent from the DOD Criminal Investigative Service and Betso made false statements concerning Wedtech to a Special Agent with the Department of Labor–Office of Labor Racketeering when he had been served with federal grand jury subpoenas. On February 17, 1987, Mario Biaggi made false statements in a deposition held ancillary to federal grand jury proceedings regarding Wedtech.

DISCUSSION

I. *Motions Denied at Oral Argument*

1. *Ronald Betso.* Defendant Betso's motion for dismissal of Counts One and Two, the RICO counts of the Indictment, was denied, as was his motion for sever-

ance of the substantive Counts Twenty–Five, Twenty–Eight, and Fifty, essentially for the reasons set forth in this court's earlier opinion denying similar relief to defendant Stanley Simon. *United States v. Biaggi,* 672 F.Supp. 112 (S.D.N.Y.1987). Decision was reserved on Betso's motion for a bill of particulars. *See infra.*

2. *Richard Biaggi.* Defendant Richard Biaggi made a three-part motion (a) to dismiss the Indictment because of an alleged conflict of interest within the Department of Justice, inasmuch as the Attorney General of the United States, Edwin Meese III, is the subject of an investigation into his relations with the Wedtech Corporation by an Independent Counsel; (b) in the alternative, to disqualify the Department of Justice, for the same reasons; (c) in the alternative, to hold a hearing regarding the propriety of the Department of Justice's prosecuting this case, for the same reasons. At oral argument Richard Biaggi's counsel moved for production of documents regarding Wedtech's relationship with the Attorney General and certain of his associates. All of these motions were denied, essentially for the reasons stated by this court when it granted a motion by the Independent Counsel investigating the Attorney General to quash a subpoena *duces tecum* served by Richard Biaggi. *United States v. Biaggi,* 674 F.Supp. 1034 (S.D.N.Y.1987). Richard Biaggi's motion to dismiss the RICO charges against him in Counts One and Two of the Indictment were denied, essentially for the reasons stated in this court's October 23, 1987 opinion. His motion to dismiss the mail fraud counts of the Indictment against him because they are vitiated by *McNally v. United States* was denied, essentially for the reasons set forth *infra.* Decision was reserved on his motion to dismiss the Indictment as to him insofar as it derives from his immunized testimony before a New York County grand jury. His motion to dismiss the Indictment under Fed.R.Crim. P. 6(e) because of abuse of the grand jury process is denied for the reasons stated *infra.*

3. *John Mariotta.* Decision was reserved on all of John Mariotta's motions. Mariotta's motion for access to records of the grand and petit jury selection procedures of the Southern District of New York was granted in an order dated November 9, 1987. Discovery on this issue is to be completed by the trial date of January 4, 1988, and is to be conducted in ongoing cooperation with the Government.

4. *Mario Biaggi.* Decision was reserved on all of Mario Biaggi's motions, which are discussed *infra.*

5. *Stanley Simon.* Stanley Simon's motions to sever his trial, to dismiss the Indictment, and to dismiss certain counts and acts in the Indictment were denied in this court's opinion of October 23, 1987. His discovery motions are discussed *infra.* His motion to bar the use of the grand jury as an investigative tool will be taken up after trial, as will his motion for an order of contempt of court arising from alleged abuse of the grand jury process in violation of an order entered by Judge Cannella on April 23, 1987.

6. *Peter Neglia.* None of Peter Neglia's pretrial motions was denied from the bench. At oral argument counsel for Mr. Neglia, under an apparent misapprehension about the propriety of this court's having read a sealed affidavit submitted by the Government *ex parte,* moved that the Government release the *ex parte* affidavit, that the court take "official notice" of prosecutorial misconduct, and that the court sanction the prosecutors. These motions were denied.

7. *Bernard Ehrlich.* Bernard Ehrlich is presently hospitalized. His capacity to stand trial on the scheduled trial date remains unknown. At oral argument counsel for Ehrlich asked whether the Government intended to introduce similar act testimony against his client. This application was denied as premature. Counsel also asked whether the Government intended to allege that Wedtech-related persons other than those named in the indictment offered or received illegal payments. This application was also denied.

*Summary.* Thus, the motions that remain to be decided in this opinion are:

1. Motions to dismiss Counts One and Two, the RICO counts (Mario Biaggi, Neglia, Ehrlich);

2. Motions to sever (Mario Biaggi);

3. Motions to dismiss the Indictment because of abuse of the grand jury process, including alleged use of immunized testimony (Richard Biaggi, Mariotta, Simon, Neglia, Ehrlich);

4. Surviving motions to dismiss the various mail fraud counts in light of *McNally* (Mariotta, Mario Biaggi, Neglia, Ehrlich);

5. Motions to dismiss other counts or predicate acts of the RICO counts (Mario Biaggi, Simon);

6. Motions to produce documents (Richard Biaggi, Mariotta, Mario Biaggi, Simon);

7. Motions for a bill of particulars (Betso, Simon, Neglia, Ehrlich, Mariotta);

8. Motions to join all consistent motions of other defendants (Betso, Richard Biaggi, Mario Biaggi, Mariotta, Simon, Neglia);

9. Motions directing the Government to identify discoverable material (Neglia);

10. Motions for leave to make further discovery or particularization motions (Mario Biaggi, Neglia);

11. Motions to bar alleged abuse of the grand jury as an investigative tool (Simon).

As is apparent from the above, there is considerable overlap between many of these motions. If a discussion of any motion does not mention a particular movant, it may be assumed that in the court's view the discussion addresses that movant's contentions adequately without elaboration.

II. *Alleged Inadequacy of the RICO Counts*

All defendants except Mariotta challenge the Indictment on the ground that its RICO counts are not properly pleaded. Simon's arguments have been thoroughly considered and rejected in an earlier opinion by this court. *United States v. Biaggi,* 672 F.Supp. 112 (S.D.N.Y.1987). The court will

**798**

now consider Mario Biaggi's arguments, the only ones that differ from Simon's.[1]

### 1. *Furtherance of the Enterprise*

■ Mario Biaggi moves to dismiss the RICO counts because the predicate acts he is charged with were not in furtherance of the enterprise. Biaggi claims that those acts—Biaggi's alleged extortion of $50,000 from Wedtech in exchange for influence peddling, his alleged extortion of five percent of Wedtech's stock, his participation in the stock transfer scheme that was meant to make it look as if Mariotta owned more than 50% of Wedtech, and his alleged obstruction of justice—do not constitute a RICO-indictable pattern of racketeering activity. Biaggi's argument is that his alleged actions do not amount to "conduct" of or "participation" in the affairs of Wedtech, as the statute requires, because those actions *victimized* and did not *benefit* Wedtech.

■ This argument is frivolous. It is perfectly clear that "conduct" or "participate" in the statute is not synonymous with "benefit" or "advance the affairs of" the enterprise. To recognize that one can conduct or participate in the affairs of an enterprise for RICO purposes while victimizing that enterprise, it is sufficient to recall that the RICO statute was originally intended primarily to prevent the "victimization" of legitimate businesses by organized crime. Indeed, it was not until the Supreme Court decided *United States v. Turkette*, 452 U.S. 576, 107 S.Ct. 2524, 69 L.Ed.2d 246 (1981), that it was clear that RICO applied to illegitimate enterprises at all. There is very clear case authority for the proposition that victimization of an enterprise can be RICO-indictable conduct or participation. For example, in *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), our Court of Appeals approved the District Court's charge that

[i]t is not necessary for the Government to prove that the affairs of the enterprise were advanced by the defendant's activities ... [i]t is only necessary to find that the acts were committed by the defendant or caused to be committed by him in the conduct of, or his participation in, the affairs of the enterprise.

The *Scotto* court went on to define "conduct of an enterprise through a pattern of racketeering" as occurring either "when (1) one is enabled to commit the predicate offenses acts solely by virtue of his position in the enterprise or involvement in or control over the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." *Id.*

Other Courts of Appeals have followed the Second Circuit on this issue. See, e.g., *United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir.) ("The fact that the union was harmed rather than benefitted [by its president's acceptance of bribes to overlook collective bargaining violations] does not remove the conduct from RICO's ambit."), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *United States v. Webster*, 669 F.2d 185, 186–87 (4th Cir. 1982) (on rehearing, reversing position on this issue taken in *United States v. Webster*, 639 F.2d 174 (4th Cir.1981), and holding that "The proper question should have been whether the affairs of the [enterprise] were *conducted* through the pattern of racketeering activity, not whether they were benefitted or advanced or whether profit to the [enterprise] resulted" (emphasis in original)), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *see United States v. Cariello*, 536 F.Supp. 698 (D.N.J.1982); *United States v. Dennis*, 458 F.Supp. 197 (D.Mo.1978).

Even if Biaggi were correct, his acts of extortion actually *did* benefit Wedtech, inasmuch as he is alleged to have solicited money and stock as a condition of helping Wedtech preserve its Section 8(a) status or getting it more contracts. Thus, Biaggi's motion has no nonfrivolous foundation in law or fact, and must be denied.

1. Neglia and Ehrlich argue that Count Two should be dismissed for charging multiple conspiracies in a single count. This contention was thoroughly examined, and refuted, in this court's opinion denying defendant Simon's severance motion.

## 2. *Duplicity of Racketeering Acts One and Two*

Racketeering Act One is the demand and receipt of five percent of Wedtech stock (two and one-half percent to Mario Biaggi under his son's name and two and one-half percent to Ehrlich), in exchange for representation before the SBA and for not withdrawing the SBA's support from Wedtech. The Government alleges that this Act consisted of at least one of the following criminal subacts:

1. Extortion under 18 U.S.C. § 1951(b)(2);

2. Receipt of a bribe under 18 U.S.C. § 201(c);

3. Receipt of a gratuity under 18 U.S. C. § 201(g);

4. Mail fraud under 18 U.S.C. § 1341.

Racketeering Act Two is the unlawful receipt of $50,000 by Biaggi from Wedtech, which the Government alleges consisted of at least one of the following criminal subacts:

1. Extortion;

2. Receipt of a bribe;

3. Mail fraud.

■ Biaggi argues that each RICO Act is the functional equivalent of a separate count and that these Acts are duplicitous because they charge more than one offense in a single Act. He argues that if he is found guilty, there will be no way to determine which criminal subact he was found to have committed and there will be no way to determine whether the jury unanimously found him guilty of any one particular criminal subact. Biaggi contends that the court should dismiss the Acts rather than ask the Government to elect one crime from each Act, because none of the subacts is sufficient to support a RICO claim.

All of the problems Biaggi points out can be solved, however, by the use of a special verdict with adequate jury instructions. The jury would be instructed that it had to agree unanimously that the defendant was guilty of at least one subact. Moreover, as Judge Sofaer noted in *United States v. Castellano*, 610 F.Supp. 1359, 1424 (S.D.N.Y.1985), by joining several criminal acts arising out of a single criminal episode in one Act, the Government protects the defendant against being found guilty of a RICO charge on the basis of only a single criminal episode. These Acts, therefore, will not be dismissed for duplicity.

## 3. *Multiplicity of Racketeering Acts One(d) and Six*

■ Biaggi next argues that the mail fraud counts and acts—Acts One(d) and Six—are multiplicitous, because they charge in separate counts a single scheme to defraud the Government. Act One(d), as described above, is Biaggi's alleged participation in a scheme to influence Neglia and acquire five percent of Wedtech stock. Act Six is the execution of the Stock Purchase Agreement, which was intended to conceal the fact that Mariotta owned less than fifty percent of Wedtech. The Government maintains that these are separate schemes.

Biaggi's argument is misconceived. The classic test for multiplicity of counts was stated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932): "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offesnes or only one, is whether each provision requires proof of a fact which the other does not." Biaggi relies on *United States v. Nakashian*, 820 F.2d 549 (2d Cir.1987), *rev'g* 635 F.Supp. 761 (S.D.N.Y.1986), to argue that the *Blockburger* test applies here. In *Nakashian*, defendant was charged with violation of three distinct conspiracy statutes. In reversing the District Court's holding that the indictment was multiplicitous, the Court of Appeals made clear its view that "in determining whether two offenses are sufficiently distinguishable from one another to infer a Congressional authorization of multiple punishment ... *Blockburger* is the *only* test to be used." 820 F.2d at 552 (citing *United States v. Albernaz*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) and *United States v. Marrale*, 695 F.2d 658 (2d Cir.), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983)). This affirmation of the primacy of the *Block-*

*burger* test is, however, simply beside the point in this case, where the counts and acts all charge Biaggi with violating *the same statute,* 18 U.S.C. § 1341. Biaggi offers no reason to believe that Congress disapproves of multiple punishments for multiple violations of the same statute: those violations are simply different offenses. The question here is whether two components of what can be characterized as one course of conduct do indeed constitute two offenses: do we have one violation of the same statute or two? Here, although the statute allegedly violated and the victim are the same, there are two distinct schemes with two distinct objects. By analogy with the *Blockburger* test, we may ask whether Biaggi could be convicted of one of these alleged violations of § 1341 but acquitted of the other. If so, the alleged violations are necessarily distinct, and there is no multiplicity. In the present case it is perfectly obvious that Biaggi could be convicted of one of the alleged § 1341 violations yet be acquitted of the other: the charges against him, therefore, are not multiplicitous, and his motion must be denied.

### III. *Motions for Severance*

Three defendants—Stanley Simon, Mario Biaggi, and Ronald Betso—have moved for severances.[2] John Mariotta joins Simon's motion for severance. That motion was thoroughly discussed, and denied in all respects, in this court's October 23, 1987 opinion. This court now denies Mario Biaggi's motion for severance as well. That motion presupposes that this court will dismiss the RICO counts, which it has declined to do, rendering the motion groundless.

### IV. *McNally*

Richard Biaggi, Mariotta, Mario Biaggi, Neglia, and Ehrlich argue that the Supreme Court's decision at the end of the 1986 Term in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) requires dismissal of the mail fraud counts of the Indictment. Richard

Biaggi's motion was denied at oral argument. Because it is fundamentally identical to the other defendants' arguments, their motions are also denied. In view of the pervasiveness of defendants' contention and the importance of the issue, this court takes the occasion to set out its views on the propriety of these mail fraud counts after *McNally.*

*McNally* was indeed widely publicized as having seriously weakened the federal mail fraud statute, 18 U.S.C. § 1341 (1982). Although *McNally* may ultimately have such an effect, it does not vitiate the mail fraud indictments in this case.

*McNally* involved a scheme in which the chairman of the Democratic Party in Kentucky, who during a Democratic Administration had de facto power to select the insurance agencies with which the state would do business, picked a particular company in exchange for an agreement that that company would distribute any resulting commissions over $50,000 to other insurance agencies selected by the chairman. One such company, owned and controlled by the chairman and the defendants, was set up exclusively for the purpose of sharing in these excess commissions. One of the mail fraud counts against defendants, as summarized by the District Court in its charge, charged defendants with devising a scheme or artifice to "defraud the citizens of the Commonwealth of Kentucky and its governmental departments, agencies, officials and employees of their right to have the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud." 107 S.Ct. at 2878 n. 4] The Supreme Court, holding that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government," *id.* at 2879, overturned the convictions:

[A]s the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of

2. Betso's motion was denied from the bench at oral argument.

the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance.... Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent.

*Id.* at 2882.

In the present case, defendants are charged with formulating a scheme and artifice "to defraud the DOD of its right to award millions of dollars in Section 8(a) contracts." Indictment, Racketeering Acts One(d) and Six; Counts Six and Thirteen. As one would expect, defendants' argument is that this is precisely the kind of intangible right the Supreme Court said, in *McNally*, is outside the scope of the mail fraud statute.

Very likely, *McNally* has generated so much attention because it can be interpreted broadly, as holding that the mail fraud statute protects only money and property, so that no count can be correctly pleaded under § 1341 unless it specifically alleges a deprivation of money or property through the use of the mails. This court views *McNally* less expansively. The Supreme Court framed the issue very narrowly: "We must consider whether the jury charge permitted a conviction for conduct not within the scope of the mail fraud statute." *Id.* at 2887. Although the clear

thrust of the opinion is that § 1341 was intended to protect "property" rights, the Court does not draw any brightline distinction between "property" rights and "intangible" rights. The clearest holding on this issue that one can draw from *McNally* is that the three hypothetical jury charges quoted above succeed in charging an interference with property rights cognizable under the § 1341, whereas the actual charge given to the jury, that defendants had defrauded the citizens of Kentucky of their right to an honest government, does not so succeed. On a narrow reading of *McNally*, the opinion stands only for the proposition that this particular kind of charge, which had been quite popular with prosecutors, charges interference with an intangible right. Such a reading allows for the possibility that a right such as the DOD's right to award contracts is a property right.[3]

The third of the hypothetical jury instructions that the Supreme Court implicitly approves as sufficient for a conviction under the mail fraud statute would, in fact, appear to encompass the right to award contracts: "[T]o convict [the jury] must find that the Commonwealth was deprived of control over how its money was spent." *Id.* at 2882. The Government's contention is that the coracketeers deprived the DOD of control over how it spent its money, by a fraudulent scheme to present Wedtech as a

**3.** Just one week ago the Supreme Court confirmed the correctness of this court's analysis in a major and widely publicized case. *Carpenter v. United States,* — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). *Carpenter* upheld the conviction of R. Foster Winans under the mail and wire fraud statutes for trading on inside information he acquired in his capacity as author of *The Wall Street Journal*'s "Heard on the Street" column, on the theory that he misappropriated confidential information that was the property, albeit intangible, of the *Journal.* Justice White, author of both *McNally* and *Carpenter,* distinguished *McNally* in the clearest terms:
    Petitioners assert that ... they did not obtain any "money or property" from the Journal, which is a necessary elememnt of [mail fraud] under our decision last Term in *McNally v. United States.*... We are unpersuaded....
    We held in *McNally* that the mail fraud statute does not "reach schemes to defraud citizens of their intangible rights to honest and impartial government," ... and that the statute is "limited in scope to the protection of property rights."

... Petitioners argue that the Journal's interest in prepublication confidentiality for the "Heard" columns is no more than an intangible consideration outside the reach of § 1341.... This is not a case like *McNally*, however. The journal, as Winans' employer, was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which "had its origin in the desire to protect individual property rights." ... Here, the object of the scheme was to take the Journal's confidential business information —the publication schedule and contents of the "Heard" column—and *its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. McNally did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.*
*Carpenter,* — U.S. at —, 108 S.Ct. at — (citations omitted) (emphasis supplied). *Carpenter*'s "misappropriation" theory is perhaps even more apposite in the present case.

company eligible for Section 8(a) contracts. One could respond, as certain defendants do, that if Wedtech had not been awarded the contracts it was, some other Section 8(a) company would have. We may suppose that such a company would have charged exactly the same amount for its services as Wedtech, so that DOD would not save any money by not contracting with Wedtech; we may further suppose that Wedtech performed all its Section 8(a) contracts as satisfactorily as any other 8(a) company would have. Nevertheless, there is a clear sense in which the DOD is deprived of control over its money: some of that money is being funneled into the coracketeers' pockets instead of being spent on the military appurtenances, such as pontoons, DOD contracted to buy. Mario Biaggi suggests that "just like in *McNally*, merely pleading infringement of the right to spend money isn't the same as pleading that the Defense Department could have contracted more cheaply with another company." This is true but not responsive to the Government's point. The point is that DOD was not, allegedly, getting the benefit of its bargain. When it contracted to buy a certain number of pontoons from Wedtech, it was not also contracting to line the coracketeers' pockets. If anything, it is Wedtech, not some other Section 8(a) company, with which the Defense Department could have contracted more cheaply if there had been no racketeering scheme such as is alleged here.

Several defendants observe that it is the SBA, not the DOD, that administers Section 8(a) contracts, so it could not have been the DOD that was defrauded. Under 15 U.S.C. § 637(a)(1) and (b)(11) (1982), federal agencies contract with the SBA for goods or services. These contracts are "set aside" because the SBA then subcontracts to certified Section 8(a) companies. The companies have the opportunity to bid on these contracts, and if the bid is reasonable and the company manifests an ability to perform, the bid is accepted. Thus, defendants argue, the DOD, for example, never really dealt directly with Wedtech, only through the mediation of the SBA. Thus it is not the DOD that is allegedly

being victimized by Wedtech. The conclusion of the argument, presumably, is that the Indictment is improperly drawn and that the relevant counts have to be dismissed.

This conclusion, however, simply does not follow. Whether or not DOD deals directly with Wedtech, DOD has a right to do as it sees fit with its more than $250 billion per year in appropriated funds. That right is infringed when the money DOD has set aside for Section 8(a) contracts is not spent on the military materiel it contracts for, but instead goes to the Wedtech coracketeers. DOD's right to spend its money as it chooses surely cannot depend on whether or not it disburses that money through an intermediary agency. Whether or not it works through such an agency, on the allegations of this Indictment DOD is being deprived of control over its money. This, as shown above, is still a basis for mail fraud under *McNally*.

In consequence, all motions to dismiss the mail fraud counts and RICO predicate acts on the basis of *McNally* are denied.

## V. *Alleged Violations of Immunity and of Grand Jury Secrecy*

Mariotta appeared before a New York County grand jury on November 25 and December 2, 1986. Richard Biaggi appeared before a New York County grand jury on December 11, 1986. Both contend that they testified before the grand jury with immunity, and both move for at least a hearing to determine whether their immunized testimony was used in preparing the Indictment against them. Richard Biaggi moves in the alternative to dismiss the Indictment on the ground that it depends on his immunized testimony. This court denies Mariotta's motion and reserves decision on Richard Biaggi's.

### A. *Mariotta*

The submissions before this court show that in late 1986 and early 1987, both the United States Attorney and the New York County District Attorney were negotiating with John Mariotta to testify in exchange

for a grant of immunity. On January 9, 1987, the United States Attorney's office broke off these negotiations. Meanwhile, Mariotta had agreed to cooperate with the New York County investigation. In October and November 1986 he spoke three times with John Moscow, head of the New York County Frauds Bureau under a verbal, "informal" grant of immunity supposedly memorialized by a letter to Mariotta's counsel of November 7, 1986. In pertinent part, that letter said:

This office, together with a Grand Jury of the County of New York, is conducting an investigation into the business and affairs of Wedtech Corp. Your client does not at this time appear to have criminal liability for conduct of which we are aware. He has indicated that he wishes to cooperate in the investigation and that he is willing to talk with us freely and openly. To avoid any possible problems, you and I have agreed that what he may tell us will not be attributed to him for any purpose, but that we will be free to follow up on and confirm that which he tells us.

Mariotta also appeared before the New York County grand jury on November 25 and December 2, 1986. Again, a supposed grant of immunity is memorialized in a letter of November 24, 1986 from Assistant District Attorney Moscow to Mariotta's counsel. In pertinent part, that letter said:

This office agrees that we will not prosecute Mr. Mariotta for or on account of any matter, transaction or thing about which he is asked to give evidence before the Grand Jury, as though he had received immunity—which he waives. Because of the potential for other litigation Mr. Mariotta conditions his waiver, other than as to crimes of violence, sales, or possession of narcotics, and bribery on his evidence being used solely for this Grand Jury's legal purposes including testimony at trial on any accusatory instruments it may file.

Because Mariotta's testimony quite likely substantially overlapped with topics of interest to the United States Attorney, and because Assistant United States Attorney

Mary T. Shannon was in contact with ADA Moscow during the relevant times (among other reasons, she avers, to try to convince him not to give Mariotta immunity), the question arises whether any of the information Mariotta conveyed to Moscow or to the New York County grand jury was presented to the federal grand jury, tainting the Indictment. Thus, Mariotta asks for a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and an opportunity to conduct discovery on this question.

The United States suggests that this court inspect the New York County grand jury minutes *in camera* to determine whether they provide any basis for a *Kastigar* hearing. The United States argues that Mariotta's grand jury testimony consisted only of denials that he knew anything about Wedtech, and so could not have contained information the federal grand jury could have used, even if it or the federal prosecutors had been exposed to the grand jury minutes. Mariotta does not object to this request, although he suggests that it is unnecessary for this court to grant it.

■ In this court's view, the "letter immunity" conferred by ADA Moscow's two letters do not appear to bind the Federal Government in any way. The November 7 letter, as the quotation given above makes clear, is a *confidentiality agreement* between Mariotta and the New York District Attorney's office. That agreement could have been violated by the District Attorney's office in any number of ways, *cf. United States v. Wellins*, 627 F.2d 969 (9th Cir.1980), including telling AUSA Shannon the substance of Mariotta's testimony. A confidentiality agreement, however, is not a promise of immunity. Moreover, the United States Attorney's office is not a party to this agreement; Mariotta offers no authority for the proposition that *it* is forbidden to use information it got, if any, by way a violation of the agreement by the New York County District Attorney's Office.

The November 24 letter memorializes a *waiver* of immunity, as it clearly indicates,

pursuant to N.Y.Crim.Proc.L. § 190.45. It happens that this particular waiver of immunity is conditional. The conditioning sentence, however, would be nonsensical if read as taking back what Mariotta has given. It is best understood as a condition, subsequent in form but precedent in effect, on what is effectively a *contract* between the District Attorney and Mariotta. The District Attorney, in consideration for Mariotta's truthful testimony, has promised not to use that testimony for any other purpose than the grand jury's investigation. Similar though not precisely identical agreements have in fact been held to be contracts. *United States v. Girdner*, 773 F.2d 257, 259 (10th Cir.1985) ("The fundamental flaw in appellant's argument is that he entered into an informal agreement with the prosecution to provide truthful testimony in exchange for immunity from prosecution as a result of his substantive testimony.... Appellant's testimony was not compelled by court order as required by [18 U.S.C.] § 6002. We have recently had before us a similar informal agreement [and] found ... that it is 'simply a contract.'") (citing *Hembree, infra*); *United States v. Hembree*, 754 F.2d 314, 317 (10th Cir.1985) (probation revocation context) ("In this case Hembree was granted informal immunity, meaning that no court order, as required by § 6002, granting her immunity was either requested or obtained. Consequently, Hembree's agreement with the United States Attorney was simply a contract which in no way bound the district court."). The federal District Courts have strongly disapproved of *federal* prosecutors' use of letter immunity, *e.g. United States v. Kouba*, 632 F.Supp. 937, 944 (D.N.D.1986) ("The Supreme Court of the United States seems to frown upon informal grants of immunity.... [I]nformal immunity is a damnable practice and the use of it should stop both for the sake of the witnesses and the Grand Jury.") (citing *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984)); *United States v. Kilpatrick*, 594 F.Supp. 1324, 1336–38 (D.Colo.1984). Indeed, the *Kilpatrick* court held that, for federal prosecutors at least, "[p]ocket immunity is *illegal;*

when granting immunity, the Department of Justice must comply with the requirements of 18 U.S.C. §§ 6002 and 6003." *Id.* at 1349 (emphasis supplied).

██ In light of this federal disapproval of letter immunity, this court can find no considerations of federalism or of New York law that require it to honor a grant of letter immunity by a state prosecutor. The submissions before this court do not show that Mariotta had immunity from state and therefore federal prosecution; all that has been presented to this court is a contract with state officers, which they may or may not have broken.

The November 24 letter concludes: "This agreement will become effective when your client signs the waiver of immunity in the Grand Jury." An executed waiver is a necessary condition for a grant of immunity in compliance with N.Y.Crim.Proc.L. § 190.45(1). If Mariotta can demonstrate that he complied with New York state procedure for granting immunity, this court would reevaluate its conclusion that he had nothing more than letter immunity. It appears from the letter's phrasing, however, that it is a part of the grand jury minutes, refuting Mariotta's contention that it is unnecessary for this court to inspect those minutes. In the present state of the record before us, this court must deny Mariotta's motion, without prejudice to its renewal should Mariotta contend that the grand jury minutes contain a waiver of immunity properly executed in accordance with § 190.45, in which case the court will inspect the minutes.

### B. *Richard Biaggi*

Like Mariotta, Richard Biaggi claims that his indictment was secured by the use of immunized grand jury testimony, and moves to dismiss on that ground; he also moves to dismiss on the ground that he has transactional immunity; at the least, he moves for a *Kastigar* hearing on whether the Government used his immunized testimony to secure the Indictment.

Biaggi asserts that he testified with transactional immunity before a New York County grand jury on December 11, 1986.

Assuming that he did not waive immunity, this contention is correct: New York automatically grants transactional immunity to grand jury witnesses absent waiver. *See* N.Y.Crim.Proc.L. § 190.40 and Practice Commentary.

Biaggi's argument for dismissing the Indictment is that it was his state grand jury testimony that led the Wedtech cooperators to cooperate with the federal prosecution. Thus, he contends, not only has his grand jury testimony been used against him, it has been used in the especially pernicious way condemned in *United States v. Kurzer*, 422 F.Supp. 487 (S.D.N.Y.1976).

Biaggi next argues that because the Wedtech investigation was a joint federal-state effort, his state transactional immunity entitles him to federal transactional immunity as well, not just the federal use immunity of *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

Third, Biaggi argues that he should be allowed a *Kastigar* hearing of very broad scope: "the Government should produce not only Mr. Biaggi's grand jury testimony, but all evidence submitted to the indicting grand jury and all evidence it proposes to offer at trial." Biaggi Memo of Law 13. The grand jurors should be questioned. *Id.* 14. All federal and state prosecutors who had anything to do with the investigation should be witnesses. *Id.*

■ Finally, Biaggi moves for an order under Fed.R.Crim.P. 6(e)(3)(C)(ii) for inspection of the grand jury minutes. He argues that there is a possibility that the grand jurors may have seen a story in the *New York Times* that stated he was cooperating with the concurrent investigation into Citisource, Inc.[4] The court denies Biaggi's Rule 6(e) request. Such requests should be granted "sparingly in extreme cases only when the defendant advances facts, upon a sworn affidavit or sworn testimony, which clearly reflect a prejudicial irregularity in the grand jury proceedings." *United*

*States v. Aman*, 13 F.R.D. 430, 431 (N.D. Ill.1953). Biaggi has offered nothing more than conjecture.

There is strenuous disagreement between Government and defendant about the relevance of *United States v. Kurzer*. Kurzer was an accountant for one Steinman, and under a grant of formal immunity testified before a grand jury that handed down two indictments against Steinman. Steinman ultimately cooperated with the Government, and the information he provided led to an indictment of Kurzer. As noted above, Biaggi says it was the news of his appearance before the grand jury that led the Wedtech cooperators to cooperate. The Government simply denies that Biaggi could have been the source of the cooperators' testimony, noting that Biaggi has not tried to show that he testified on subjects relating to the Indictment.

The *Kastigar* burden of proof on the Government is to "prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665. *Kurzer* stands for the proposition that the source's motivation can be relevant to this burden:

> [S]ince Steinman's identity and potential value as a witness were not discovered through Kurzer, the only way in which Steinman's testimony could be derived, either directly or indirectly, from Kurzer's information is if the giving of that information contributed to Steinman's decision to testify. Steinman's motivation is thus directly relevant to the central question in this case.

534 F.2d at 511. The Second Circuit stated that to carry its burden of proof the Government would have to make good on its claim that "Steinman would have testified against Kurzer because of the case the Government had developed against him entirely apart from Kurzer's information, even if the prior indictment to which Kur-

---

4. Citisource was a company that had a contract with the New York City Parking Violations Bureau to sell a hand-held computer. The involvement of Bronx Democratic Party president Stan-

ley Friedman with Citisource was one of the first instances of corruption among high New York City officials to be widely publicized.

zer's information had contributed never existed." *Id.*

This court discerns parallels, though not exact ones, between *Kurzer* and the present case sufficient to justify the Government's suggestion that we inspect the grand jury minutes *in camera.* Accordingly, decision is reserved on Richard Biaggi's motion for a *Kastigar* hearing. Of course, only if the court grants such a hearing will it be necessary to take up the question of its scope.

■ The court denies Biaggi's motion to dismiss the indictment on the ground that he has federal transactional immunity because this was a joint state-federal investigation. Biaggi's suggestion is novel and interesting, but he produces no support for it. The authorities he cites concern only the extent of New York transactional immunity.[5]

### C. *Grand Jury Secrecy*

This case has been the subject of extraordinary publicity, both in New York City, where it is presently the most visible of a series of cases that have cast doubt on the integrity of local government officials, and nationwide, primarily because Attorney General Meese is the subject of an Independent Counsel's investigation into his relation with Wedtech.

Before the Government filed its First Superseding Indictment, when the only defendant was Stanley Simon, this case was before Judge Cannella, who on April 23, 1987, entered an order setting stringent limits on extrajudicial statements by the parties and their counsel, who can answer questions from the public communications media only with the statement "No comment," or "Whatever we have to say will be said or has been said in court." On July 10, 1987, Judge Cannella declined to vacate this order upon an application by various media corporations. In his July 10 memorandum and order Judge Canella noted that "the history of this case points up what the Court can only describe as a shameful abuse of grand jury secrecy." Memorandum and Order, *United States v. Biaggi,* 664 F.Supp. 780, 792, No. 87 Cr. 265 (JMC), at 22.

Shortly afterward, the case was transferred to this court, where a motion for reargument was denied on July 27, 1987. Transcript of July 27, 1987 Pretrial Conference 2, 46. At the same time, this court ruled that a hearing on Simon's pending motion for contempt of the Order would be held *after* trial. *Id.* at 44. Simon's counsel, Maurice Nessen, was unclear about the nature of his motion, which he characterized as one for a general investigation the Court had power to conduct. When the court instructed Mr. Nessen to bring his motion as a contempt motion, to be heard at the end of trial, Mr. Nessen said: "You understand, your Honor, that in our omnibus motion we will be directing motions to dismiss on the basis of grand jury secrecy violations, but that has nothing to do with the contempt proceeding." *Id.* at 46. Such a motion to dismiss is now before us.

■ This court's position was clearly set out at the pretrial conference. The court does not dispute defendants' entitlement to a hearing on abuses of grand jury secrecy, but has already announced that a hearing on a contempt motion, which will deal with the same issues, the same United States Attorneys, and (if Simon is to be believed) the same grand jury, will be held *after* trial. Simon will not be prejudiced by this timing, even though he is moving to dismiss the Indictment or to inflict some sort of penalty on the Government such as depriving it of its peremptory challenges. To the extent that his concern is the effect of pretrial publicity on the grand jury, which appears to be the focus of his Reply

---

5. The Government does no better in refuting Biaggi's suggestion, however. The cases it cites as dispositive, *United States v. Nemes,* 555 F.2d 51 (2d Cir.1977) and *United States v. Ostrer,* 506 F.Supp. 962 (S.D.N.Y.1980) (Duffy, J.), do not clearly involve *joint* investigations. *Ostrer* in particular seems in fact to involve independent state and federal investigations, and merely to reiterate the *Murphy-Kastigar* principle that state transactional immunity grants federal use immunity. Nonetheless, the burden of proof is Biaggi's, and this court does not consider that he has carried it.

Memorandum of Law, there are no grounds for dismissing the Indictment. *United States v. Washington,* 705 F.2d 489 (D.C. Cir.1983). The *Washington* court held, moreover, that "[s]ince the concern over adverse publicity is its effect on the fairness of the ensuing trial ... it was not error to fail to hold an evidentiary hearing concerning the effect of preindictment publicity on the grand jury." *Id.* at 499. There was far less publicity in *Washington* than in this case, but the point stands.

Moreover, Fed.R.Crim.P. 12(e) allows the court to defer determination of a motion made before trial unless "a party's right to appeal is adversely affected," which is not the case here. This court observes that in *United States v. Vetere,* 663 F.Supp. 381 (S.D.N.Y.1987), relied on by Simon for the propriety of dismissal of an indictment due to prosecutorial misconduct, Judge Sweet actually did decide the motion *after* Vetere's trial and conviction.

D. *Misuse of Grand Jury to Gather Evidence*

In a motion docketed on September 18, 1987, Simon charges that the Government is still using the grand jury to gather evidence against him. Assistant United States Attorney Shannon responds that she has told Mr. Nessen that other grand juries have been investigating Simon on other bribery charges since his April 1 indictment, that this is perfectly proper, and that in connection with this case she has used only Rule 17(c) subpoenas since April 1. In further response, Assistant United States Attorney Little submits a memorandum of law, and AUSA Shannon a sealed ex parte affidavit. After consideration of all these submissions, the court denies Simon's motion.

VI. *Inadequate Pleading of Perjury and Obstruction of Justice Counts*

A. *Mario Biaggi*

Racketeering Act Nineteen and Count Eighteen charge Mario Biaggi with obstruction of justice and perjury. Count Eighteen specifies the allegedly perjurious utterance: in a deposition related to the grand jury proceedings on February 17, 1987, Biaggi was asked: "Apart from the two letters of January 15th and the two letters of June 26th, did you contact anyone else in Government about Welbilt or Wedtech?" Biaggi answered: "I have no recollection of having done that."

Biaggi argues that the question is ambiguous in at least five ways (for example, Which of the four letters mentioned does it refer to? What "Government" is being asked about?). Thus, his answer could have been true on one of the many ways to understand the question; hence, his answer was not perjurious. Having examined Biaggi's deposition, the court concludes that this defense is meritless. To take only the examples given: as the Government explains, the four letters referred to had all been discussed already at the deposition; in context, "Government" clearly means "Federal Government." With these as with Biaggi's other examples, there is no real ambiguity, and no real doubt that Biaggi understood the question.

Biaggi's statement that he could not recall can serve as the predicate for a prejury charge. *Battaglia v. United States,* 653 F.2d 419, 421 (9th Cir.1981) ("A witness who testified that he does not remember an event can be convicted of perjury if it can be proven beyond a reasonable doubt that he does, in fact, remember the event.").

B. *Stanley Simon*

Simon appeared before the federal January 1985 Additional Grand Jury on February 6, 1986. Count Twenty-Two charges him with perjury because he answered "No" to the questions: "Have you ever received cash, a gift or anything of value, either directly or indirectly, in connection with your official duties as a City Councilman or as a Borough President of the Bronx?"; "Have you ever been offered cash, gifts or anything of value in connection with your official duties as a City Councilman or as Borough President of the Bronx?"; and "Have you ever solicited any such items, and I mean cash, gifts, or any-

thing of value in connection with the performance of your duties as an elected official?"; "Or as an appointed official?" These answers are also the basis of the obstruction of justice charge in Act Sixteen.

Simon says that both Count and Act should be dismissed because the questions had nothing to do with Wedtech and the answers could not have been perjurious because the questions were "vague." The questions were vague, Simon contends, in that they all used the phrase "in connection with," as in "Have you ever solicited any such items, and I mean cash, gifts or anything of value in connection with the performance of your duties as an elected official?" "In connection with" here, says Simon, "could encompass any kind of political contribution," including, for example, legitimate ones. Simon Memorandum of Law 16.

This argument verges on frivolity. The questions are not "vague," especially inasmuch as (as the Government points out) Simon was told at the beginning that the grand jury was investigating political corruption in the Bronx. The motion to dismiss Count Twenty-Two is denied.

■ The motion to dismiss Act Sixteen is based on the claim that the alleged perjury is not related to Wedtech; nobody asked about it, Simon says, so the grand jury must not have been investigating it. The Government's response that Simon's contention is "counterintuitive" carries no weight with this court. In this court's view, what matters is the relation between the question and answer and Wedtech; it is irrelevant what the grand jury was investigating. If Simon accepted Wedtech payments, he perjured himself when he denied receiving any payments, no matter what the grand jury was investigating. Although the chronology makes it unlikely that the grand jury was specifically interested in Wedtech (the DOD began investigating it in June 1985: AUSA Shannon began investigating Bronx officials, including Simon, in November 1985; and the Southern District of New York's Wedtech investigation began in mid-March 1986), it

was investigating corruption in the Bronx in general. It presumably would have investigated Wedtech had Simon answered that he had received payments from Wedtech. Thus, there is sufficient connection between the alleged perjury and Wedtech to sustain the obstruction of justice charge. The motion to dismiss Act Sixteen is denied.

## VII. *Mario Biaggi's Motion to Dismiss for Improper Venue*

Biaggi claims that venue for Counts Seven through Nine, charging inadequate disclosure on his financial disclosure forms required by the Ethics in Government Act, is improperly laid in this District, because the filing process occurred exclusively in the District of Columbia.

The Government claims that it will prove at trial that Biaggi's disclosure statements were prepared in the Southern District of New York. Because this issue involves a dispositive question of fact, the court reserves decision until the conclusion of trial.

## VIII. *Motions for Bills of Particulars*

Defendants Betso, Ehrlich, Mariotta, Neglia, and Simon submitted motions for bills of particulars. Counsel for defendants Ehrlich and Neglia asserted in their initial moving papers that the Government had not responded to their requests for bills of particulars. The Government responded to Ehrlich's request five days later, and Ehrlich did not challenge the response either in reply papers or at oral argument. Having received no information to the contrary, the court concludes that Ehrlich is satisfied with the Government's response. When defendant Neglia received the Government's response, he resubmitted his motion.

At the outset, this court notes that defendants Betso, Mariotta, and Neglia have not fully complied with the requirements of Local Criminal Rule 3(d). Rule 3(d) provides:

Upon any motion, objections or exceptions addressed to a bill of particulars or answers or to discovery and inspection, the moving party shall:

(1) File a copy simultaneously with the filing of the moving papers in all instances in which the demand for a bill of particulars or the answers or the demand for discovery and inspection have not been filed previously; and

(2) Specify and quote verbatim in the moving papers each requested particular or answer and each item as to which discovery and inspection is sought to which objection or exception is taken and immediately following each specification shall set forth the basis of the exception or objection.

No motion described in this subparagraph shall be heard unless counsel for the moving party files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issue raised by the motion without the intervention of the court and has been unable to reach such an agreement. Such affidavit shall specify the time when, the place where and the duration of the said conference. If part of the issues raised by motion have been resolved by agreement, the affidavit shall specify the issues so resolved and the issues remaining unresolved.

Counsel for defendant Betso failed to certify in his affidavit that he had attempted to confer with the Government. Defendant Mariotta failed to quote the requested particulars he sought. Only the most recent of defendant Neglia's motions provides either the required certification or quotations. To the extent that any defendant's motion for a bill of particulars failed to comply with the requirements of the rule, that defendant's nonconforming requests are hereby denied without prejudice. The court has considered all of defendants' properly formed requests, and sets forth its rulings below.

■ The proper scope and function of a bill of particulars is to inform the defendant of the facts essential to the preparation of his or her defense, to prevent unfair surprise, and to foreclose a second prosecution for the same offense. *See*

*Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). Although the decision to direct the filing of a bill of particulars is within the discretion of the trial court, *see United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984), the court should not order the filing unless "the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he [or she] is accused." *United States v. Leonelli,* 428 F.Supp. 880, 882 (S.D.N.Y.1977). The request for a bill may be denied, therefore, when the information sought is contained in the indictment, *see United States v. Matlock,* 675 F.2d 981, 986 (8th Cir.1982), or when extensive discovery has already been afforded to the defendant, *see United States v. Society of Independent Gasoline Marketers,* 624 F.2d 461, 466 (4th Cir.1979), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981). On the other hand, the Government may not simply deluge defendants with thousands of documents when more specific guidance is necessary to their understanding of the charges and preparation for trial. *See Bortnovsky,* 820 F.2d at 575.

It is a firmly established rule in this Circuit that a bill of particulars is not to be used as a general investigative tool for the defense or as a device to compel production of the Government's evidence prior to trial. *See United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974); *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987). Nor may the defendants compel disclosure of the Government's legal theory. *See Leonelli,* 428 F.Supp. at 882. The Government need not reveal "the precise manner in which the crime charged in the indictment is alleged to have been committed," *United States v. Andrews,* 381 F.2d 377, 377–78 (2d Cir.1967); *United States v. Carroll,* 510 F.2d 507, 509 (2d Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378 (1976); nor the exact time and place and persons present at each overt act named in the indictment, *see United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y. 1983).

■ Many of defendants' requests are barred by these principles. Defendant Neglia's request, for example, that the Government "State specifically each alleged date, time, person present, place, nature of conversation, amount, nature of item, person from whom and person to whom it is alleged that 'Bernard Ehrlich conferred additional benefits in the form of food, entertainment and other expenses paid to or on behalf of Peter Neglia'" is an impermissible attempt to compel the Government to provide evidentiary details of its case. *See United States v. Lavin,* 504 F.Supp. 1356, 1361 (N.D.Ill.1981). With the exceptions noted below, therefore, defendants' requests for particulars are denied.

The Government rightly notes that it has already disclosed substantial materials to defendants and that it has provided defendants with a detailed index to assist them in reviewing these voluminous files. Nevertheless, the index alone is apparently at least 120 pages long and at least one defendant has complained that it is not wholly accurate. Pursuant to the recent Second Circuit case of *United States v. Bortnovsky, supra,* defendants may not be compelled to wade through thousands of documents in an effort to locate materials essential to their defense. The court therefore directs the Government to set forth a bill of particulars with the following items.

1. The Government shall identify by redweld number, file number, and page number or shall furnish copies of all correspondence between Wedtech, SBA, and DOD and related documents regarding progress payments to Wedtech and all documents relating to the alleged $4.7 million progress payment fraud allegedly concealed by Wedtech, if this is to be an issue at trial.

2. The Government shall identify by redweld number, file number, and page number or shall furnish copies of all executed stock option agreements between Wedtech and all "grantees" including but not limited to those allegedly approved at the Board of Directors meeting of August 13, 1985.

3. The Government shall identify by redweld number, file number, and page number or shall furnish copies of all shareholders meetings held with respect to options issued and executed by any grantee including but not limited to those grantees named in the minutes of the August 13, 1985 meeting of the Board.

4. The Government (a) shall specify from whom it is alleged that "Peter Neglia received benefits in food entertainment and other benefits from representatives of Wedtech," (b) shall specify the nature of the "other benefits" allegedly received, and (c) shall identify by redweld number, file number, and page number or shall furnish copies of all items available pursuant to Rule 16(a)(1)(C) pertaining to items (a) and (b) of this paragraph.

## IX. *Motions for Discovery*

Defendants have made numerous requests for discovery of documents in the possession of the Government. The court follows the same policy here that it adopted with respect to defendants' motions for bills of particulars and denies without prejudice all motions that failed to conform to Local Criminal Rule 3(d). The court has considered all properly formed motions for discovery. Any motion for discovery not specifically discussed below is hereby denied.

### A. *List of Government Witnesses*

■ Defendants move the court for an order directing the Government to produce any documents reflecting the names and addresses and telephone numbers, both home and business, of all persons whom the Government intends to call as witnesses at trial. Although Rule 16 does not require the Government to disclose its witness prior to trial, the court may order the disclosure when a balancing of the defendants' need for disclosure and the Government's need for concealment indicates that such an order would be in the interests of justice. *See United States v. Cannone,* 528 F.2d 296, 301–02 (2d Cir.1975). The cases also indicate that this discretion should be exercised only when the defense

makes a *specific* showing of need; an "abstract conclusory claim [by the defense] that ... disclosure [is] necessary to its proper preparation for trial" is an inadequate ground for granting such discovery. *Id.* at 301–02; *see Feola,* 651 F.Supp. at 1138; *Wilson,* 565 F.Supp. at 1438.

In an apparent effort to make this particularized showing of need, some defendants argue that the criteria for disclosure listed in *United States v. Turkish,* 458 F.Supp. 874, 881 (S.D.N.Y.1978), *aff'd,* 623 F.2d 769 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), favor discovery in this case. This court recognizes that defendants have not been indicted for a crime of violence and that preparation of a defense is likely to be complex and difficult. The considerations supporting defendants' motion, however, must be weighed against the Government's need for concealment.

The Government argues that there is a real danger of intimidation of witnesses in this case. It points out that one defendant was already indicted for trying to influence a potential witness in another trial. It suggests that another defendant, or a member of his family, may have attempted to intimidate two likely witnesses in this trial. To order discovery when the Government has "advanced specific grounds for denying the defense's requests," this court would have to find that disclosure presented no real dangers, "despite the Government's protestations to the contrary." *Cannone,* 528 F.2d at 302. The dangers do not, however, appear to be negligible. The court also notes that one of the moving defendants admitted at oral argument that the defendants already know many of the Government witnesses because they are named in the Indictment or have been discovered through pretrial investigation. In light of this admission, the court finds that defendants' alleged need for further disclosure is outweighed by the Government's need for concealment. The request for an order requiring production of a list of witnesses is accordingly denied.

### B. *Press Releases*

Defendants seek copies of every press release issued by the Government and a transcript or recording of every press conference related to the indictment. They say that they need this material to discover the extent of alleged leaks of information from grand jury proceedings related to this indictment. This court has already determined that it will hear argument concerning the alleged leaks after the trial in this case is complete. The motion for production of press releases is, therefore, denied without prejudice.

### C. *Documents Pertaining to Related Cases*

Defendants Richard Biaggi, John Mariotta, and Stanley Simon seek production of documents pertaining to the involvement in Wedtech of Government officials not named in the indictment. The defendants have failed altogether to show how these documents are "material to the preparation of [their] defense." Fed.R.Crim.P. 16(a)(1)(C). The fact that other Government officials in addition to those named in the present indictment might also have engaged in illegal conduct has no bearing on the innocence or guilt of Richard Biaggi or John Mariotta. The criminal indictment is not a zero sum game: the guilt of one individual does not exonerate another. Nor is the material relevant for the purpose of establishing the full extent of the conspiracy. The Government need not prove that defendants were aware of every detail of the conspiracy to obtain a conviction pursuant to the present indictment. The defendants' request for this information is denied.

### D. *Agreements Between the Government and Cooperating Witnesses*

Pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, defendants Ehrlich, Mariotta, and Neglia seek production of agreements between the Government and cooperating witness that might bear upon their credibility. Defendants correctly assert that *Brady* applies both to

exculpatory and to impeachment evidence. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). None of the cases cited by defendants, however, requires that impeachment material be produced immediately, as they request. *See United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *United States v. Tucker,* 495 F.Supp. 607, 610 n. 2 (E.D.N.Y. 1980). Rather, "[i]nformation bearing on a witness' credibility, such as grants or promises or immunity, plea bargain arrangements, or other consideration promised by the Government in return for testimony must be turned over at the same time as other 18 U.S.C. § 3500 materials." *United States v. Massino,* 605 F.Supp. 1565, 1581 (S.D.N.Y.1985), *rev'd on other grounds,* 784 F.2d 153 (2d Cir.1986); *see United States v. Mitchell,* 372 F.Supp. 1239, 1257 (S.D.N.Y.1973). The Government says that it will treat this information in the same fashion as other § 3500 materials, by turning it over the day before each witness testifies. The court also notes that the Government has already begun disclosure of prior bad acts of several key witnesses, so the defendants are receiving at least some impeachment material considerably in advance of trial. Defendants' request for earlier production of additional impeachment material is denied.

### E. *Statements by Third Parties Reporting Statements by a Defendant*

■ Pursuant to Rule 16(a)(1)(A), defendants Mariotta and Simon seek statements that they may have made to third parties who in turn may have reported the statements to the Government, which at some point memorialized them. Discovery Memorandum for John Mariotta, at 10; Affidavit of Maurice M. Nessen, at 21. Rule 16(a)(1)(A) permits a defendant to inspect and copy or photograph both 1) any relevant written or recorded statements made by the defendant that are in the Government's custody, possession, or control and 2) the substance of any oral statement

made by the defendant that the Government intends to offer at trial and that was made in response to interrogation by a person then known to the defendant as a Government agent. The question that arises with respect to this rule is whether it covers not merely statements obtained directly from the defendant, whether written or oral, but statements that have been obtained from third parties (who may be witnesses at trial) that purport to repeat the defendant's statements. Defendants urge this court to follow the Eastern District of New York in *United States v. Gallo,* 654 F.Supp. 463, 475 (E.D.N.Y.1987), in adopting the more expansive interpretation of the rule.

This court has considered the reasoning that led the Eastern District to adopt the broad interpretation of Rule 16, but it finds the interpretation impossible to reconcile with the actual language of the rule. Rule 16 permits discovery 1) of written or recorded statements *made by the defendant* and 2) of oral statements that the prosecution intends to offer at trial, *if the statement was given in response to interrogation by any person then known by defendant to be a Government agent.* The first clause permits the defendant to inspect or copy a statement he or she wrote and to copy a mechanical or electronic recording of his or her statement. The second clause clearly suggests that the subject of an interrogation whose officially received statement would be discoverable is the defendant only. It also implies that a statement given (or overheard) by a party *not* a Government agent (and therefore not knowable to be one) would not be discoverable. The court recognizes that Rule 16 has not always received the narrow interpretation provided herein, *see United States v. Thevis,* 84 F.R.D. 47, 55 (N.D.Ga. 1979), but it is not persuaded to ignore the express wording of the rule.

Defendants argue that subdivision (a)(2) of Rule 16 provides an exception to the usual rule against disclosure of statements not obtained directly from the defendant. Rule 16(a)(2) says:

Except as provided in paragraph[ ] (A) ... of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500.

Subdivision (a)(2) bars the discovery of statements of witnesses, except as provided in subdivision (a)(1)(A). Defendants argue that subdivision (a)(1)(A) permits discovery of the statements even of third-party witnesses to the extent that such statements report statements of defendants. Defendants argue that just as the Government cannot refuse discovery of defendants' own oral statements by claiming that the Government interrogator's notes recording those statements are "work product," the Government cannot refuse discovery of defendants' oral statements obtained indirectly from nongovernmental third parties by claiming that the third parties' statements are § 3500 material. There is a much simpler interpretation of the rule, however, that is wholly consistent with its wording, the legislative history, and the requirements of § 3500.

Defendants' proposed interpretation of Rule 16 overlooks the fact that subdivision (a)(1)(A) itself mentions witnesses who may be Government witnesses at trial. Subdivision (a)(1)(A) provides that when the defendant in a criminal case is a corporation, partnership, association, or labor union, the defendant may move for discovery of the recorded testimony of any witness before a grand jury whose testimony, or conduct at the time of the offense, could legally bind that defendant. The most natural reading of subdivision (a)(2) is that the Government cannot refuse to disclose testimony by these witnesses, testimony that is expressly discoverable pursuant to subdivision (a)(1)(A), on the grounds that it is § 3500 material. The statements of these witnesses, and only these witnesses, are discoverable—even if the Government intends to

call them at trial—because a defendant that is not a natural person can speak only through its human officers and employees and a defendant is entitled to discover his or her or its own statements.

Examination of the legislative history regarding Rule 16 confirms this interpretation. The Notes of the Advisory Committee on Rules make it clear that the object of the amendments to the rule was not to make discoverable the statements of third parties, but to remedy two deficiencies in an earlier version: the amendments clarified that discovery was mandatory, not discretionary and they provided that oral as well as written statements of the defendant were discoverable. The Notes of the Committee on the Judiciary, H.Rep. No. 247, 94th Cong., 1st Sess., confirm this view of the amendments. The discussion of Rule 16(a)(1)(A) in the Conference Committee Notes, H.Rep. No. 414, 94th Cong., 1st Sess. focuses on the right of non-natural defendants to the statements of the aforementioned employees and officers. The only dispute mentioned in the Notes of the Advisory Committee on Rules as to the scope of "statements" available pursuant to subdivision (a)(1)(A) concerned whether "statements" were to be confined to the defendant's own words or were to include paraphrases. The disputants were concerned not that the statements of third parties might be concealed from the defendant, but that the defendant's own oral statements, made directly to a known Government agent, might be withheld from him or her on the ground that a secondary transcription was not the defendant's own statement.

The interpretation just offered is the only interpretation that can accommodate the express language of *both* § 3500 and Rule 16. Section 3500(a) states:

In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on

direct examination in the trial of the case.

The witnesses whose statements *are* discoverable pursuant to subsection (a)(1)(A) are the *same* witnesses or prospective witnesses to whom § 3500 does not apply, namely criminal defendants. The statements of witnesses not mentioned expressly by subsection (a)(1)(A) may be discovered only as provided by § 3500, irrespective of the content of those statements. Defendants' request for the pretrial disclosure of statements of third parties is hereby denied.

### F. *Grand Jury Minutes*

■ Defendant Mario Biaggi asks this court to permit him to inspect the minutes of the grand jury that indicted him. He argues that he has a particularized need for disclosure that outweighs the presumption in favor of secrecy because the indictment is tainted if the Speech or Debate Clause was violated in presenting evidence to the grand jury and there is no way to ascertain whether or not it was violated without inspecting the minutes. *See* Fed. R.Crim.P. 6(e)(3)(C)(ii).

The immunity conferred upon members of Congress by the Speech or Debate Clause ordinarily protects legislators from liability based on actions "generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson,* 103 U.S. (13 Otto) 168, 204, 26 L.Ed. 377 (1881). Biaggi offers no evidence of any sessions of Congress in which the subject of Wedtech was debated and which could possibly serve as a basis for invoking the clause. Since the Government need not prove any specific congressional act, speech, debate, or decision to establish a violation of the statutes under which Mario Biaggi was indicted, *see United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), there is no reason for this court simply to assume that evidence of some House business was introduced to the grand jury.

■ With respect to activities by members of Congress that are not "done in a session of the House," the court notes that protection of the clause is not extended lightly to activities other than pure speech or debate. *See United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). To invoke the clause to immunize activity other than actual speech or debate in a legislative session, the member of Congress must show that the activity in question meets a two-part test: 1) it must be "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings" and 2) the activity must address proposed legislation or some other subject within Congress' jurisdiction. *See Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). In light of this standard, the Speech and Debate Clause has specifically been found not to immunize a member of Congress from criminal prosecution for accepting a bribe or gratuity under 18 U.S.C. §§ 201(c), (g). *See Brewster, supra.* "The Speech and Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." *Id.* at 528, 92 S.Ct. at 2545.

Mario Biaggi has not even attempted to explain how the indictments for bribery, extortion, mail fraud, and other criminal acts could be based on acts that were "integral to the deliberative process." This failure is particularly telling in light of the Government's uncontested representation that none of the documents subpoenaed from Mario Biaggi's office were ever produced. The wholly speculative basis for his motion suggests that his request for inspection is in fact an impermissible attempt to circumvent the requirements of § 3500. This court finds that Mario Biaggi has not carried the heavy burden of showing a particularized need for disclosure outweighing the need for secrecy. *See Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); *United States v. Williams,* 644 F.2d 950 (2d Cir.1981).

Richard Biaggi's motion for an order under Fed.R.Crim.P. 6(e)(3)(C)(ii) for inspection of the grand jury minutes has been discussed *supra.*

## X. *Simon's Sealed Affidavit*

On November 9, 1987, counsel for defendant Simon filed an affidavit under seal directed to claimed inadequacies in the Government's bill of particulars and other discovery. By letter dated November 23, 1987, counsel for defendant Mariotta expressly joined Simon's application for relief. The Court reserves decision on the application.

## XI. *Motions for Leave to File New Motions*

Defendants request leave to file additional discovery motions as new facts are revealed by discovery and investigation. This motion is granted to the extent that new information is disclosed of which defendants could not have known at the time these motions were filed.

## CONCLUSION

This opinion constitutes the final disposition of all matters raised in the omnibus pretrial motions pending before the court except those matters expressly dismissed without prejudice or deferred for resolution until after trial. Any motion or request not opposed by the Government, in its papers in opposition to the omnibus motions or in its responses to requests for bills of particulars or discovery, shall be deemed granted. Any motion or request opposed by the Government, in its papers in opposition to the omnibus motions or in its responses to requests for bills of particulars or discovery, and not specifically addressed herein or decided in a separate order shall be considered denied.

To summarize, the court disposes of the motions before it as follows:

Mario Biaggi's motion to dismiss the RICO counts against him is DENIED;

Mario Biaggi's motion to sever is DENIED;

All motions to dismiss the mail fraud counts on the basis of *McNally v. United States* are DENIED;

As to John Mariotta's challenge to jury selection procedures in the Southern District of New York, decision is RESERVED;

John Mariotta's motion to dismiss the Indictment against him on the ground that it was derived from his immunized grand jury testimony is DENIED without prejudice;

As to Richard Biaggi's motion to dismiss the Indictment against him on the same ground, decision is RESERVED;

Richard Biaggi's motion to dismiss the Indictment against him because he has federal transactional immunity is DENIED;

Stanley Simon's motion for orders barring the use of the grand jury as an investigative tool is DENIED;

As to Stanley Simon's motion for an order of contempt of Judge Cannella's April 23 order, decision is RESERVED;

Stanley Simon's and Mario Biaggi's motions to dismiss the RICO predicate Acts and Counts of the Indictment charging them with obstruction of justice and perjury are DENIED;

The various defendants' motions for bills of particulars and other discovery are disposed of as indicated above. Decision is RESERVED as to Stanley Simon's sealed application of November 9, 1987.